**Susan M. POWER, Plaintiff,**

v.

**ALEXANDRIA PHYSICIANS GROUP, LTD., et al., Defendants.**

**Civ. A. No. 92–1288–A.**

United States District Court,
E.D. Virginia.

May 18, 1995.

John M. Falk, James H. Falk, Robert K. Tompkins, The Falk Law Firm, plc, Washington, DC, for plaintiff.

Gary A. Godard, Edward A. Gonsalves, Godard, West & Adelman, P.C., Fairfax, VA, for Alexandria Physicians Group, Ltd., and Benedict J. Semmes, M.D.

William D. Cremins, Walsh & Cremins, P.C., Fairfax, VA, for Arlington Hosp. Ass'n.

## MEMORANDUM OPINION

ELLIS, District Judge.

At issue in this medical malpractice action is whether Virginia's $1 million statutory limit on medical malpractice damages[1] bars a patient from recovering additional damages for certain injuries where, as here, the patient has already won a $1 million judgment against a hospital for the same injuries based on the hospital's violation of the federal Emergency Medical Treatment and Active Labor Act (EMTALA).[2] In other words, the question presented is whether the medical malpractice damages cap bars recovery for malpractice injuries for which the plaintiff has already recovered the cap limit in an EMTALA suit against the hospital.

The patient involved, Susan Power, contends that she is entitled to two separate $1 million caps, one for her EMTALA claim and one for her state-law malpractice claim, because the two involve different defendants, different causes of action, and different wrongful acts. Yet, statutory language and judicial precedent compel the conclusion that having recovered $1 million for her malpractice injuries in an EMTALA suit, Power cannot recover any damages for the same injuries in a second malpractice action. As a result, defendants' motion to dismiss must be granted.

I.

On the morning of February 24, 1990, plaintiff Susan Power arrived at Arlington Hospital's (the "Hospital") emergency room, unable to walk, and complaining of chills and pain in her hip, abdomen, back, and legs. The Hospital's emergency department was operated under contract by Alexandria Physicians Group (APG), a Virginia corporation. Power was examined by two physicians employed by APG, Mitchell Heiman and Benedict J. Semmes, as well as by two nurses. None of the four noticed a sizeable boil that was visible on Power's cheek. Although neither doctor reached a definite diagnosis, Power was discharged from the emergency room and told to return if her condition worsened. It soon did. The next evening, Power returned to the emergency room and was diagnosed as suffering from septic shock. She remained hospitalized for four months. During this time, among other complications, she underwent the amputation of both legs below the knees, lost her sight in one eye, and developed severe and permanent lung damage. Doctors ultimately determined that Power's illness arose when she "seeded" an infection in her blood in attempting to lance the boil on her cheek. After four months at the Hospital, Power was airlifted to a hospital in her hometown of London, England.

Power subsequently filed a suit against the Hospital[3] alleging violation of the Emergen-

1. Va.Code § 8.01–581.15.

2. 42 U.S.C. § 1395dd.

3. Power's EMTALA claims were also brought against several other defendants, including Dr.

Semmes and APG. Prior to trial, the Court dismissed all defendants except the Hospital on the ground that EMTALA authorizes actions only against "participating hospitals." See 42 U.S.C. § 1395dd; Power v. Arlington Hosp. Ass'n, 800

cy Medical Treatment and Active Labor Act (EMTALA). *See* 42 U.S.C. § 1395dd.[4] The first EMTALA count charged the Hospital with failing to provide an appropriate screening examination on Power's first visit to the emergency room. A second EMTALA count related to Power's transfer to the British hospital. The parties filed cross motions in limine concerning the effect of Virginia's $1 million dollar medical malpractice cap, *see* Va.Code § 8.01–581.15, and Virginia's limitation on tort liability of charitable hospitals to the greater of $1 million or the hospital's insurance limits, *see* Va.Code § 8.01–38. This Court ruled that neither statute limited Power's recovery of damages under EMTALA. *See Power v. Arlington Hosp. Ass'n,* 800 F.Supp. 1384 (E.D.Va.1992), *aff'd in part and rev'd in part,* 42 F.3d 851 (4th Cir.1994). Following trial, the jury returned a verdict in Power's favor on the first EMTALA count and awarded damages of $5 million, and found in favor of the Hospital on the second EMTALA count.

The Hospital appealed the verdict to the Fourth Circuit on several grounds. In September 1992, while that appeal was pending, Power filed the case at bar, a diversity action against the Hospital, Dr. Semmes, and APG for medical malpractice. The three defendants moved to dismiss Power's malpractice claim on the ground that it had not been evaluated by a medical malpractice review panel as required by Virginia law. *See* Va. Code § 8.01–581.2.[5] Although the malpractice claim had been submitted to a review panel pursuant to the statute, the panel's chairman had dismissed the claim after Pow-

er refused to testify at a scheduled deposition in London. When Power filed the instant malpractice action, the validity and effect of the chairman's ruling were questions still awaiting final decision in the Virginia courts, for Power had brought a state-court action seeking to overturn the chairman's decision, and the matter was pending on appeal before the Supreme Court of Virginia. Because issues relevant to the malpractice action were still being resolved in appeals in both the federal and state courts, the parties agreed to a consent order staying the malpractice action until the appeals' conclusion.

The Supreme Court of Virginia reached its decision first. It held that Power's attack on the panel chairman's ruling was premature. Because the panel review process is "a mere antecedent to a potential medical malpractice action," the Supreme Court held that the validity and effect of the chairman's actions were properly litigated only in a later malpractice action. *Power v. Kendrick,* 247 Va. 59, 439 S.E.2d 345, 347 (1994).

Later that year, a divided panel of the Fourth Circuit rendered its decision on the EMTALA verdict against the Hospital. The Hospital's appeal was successful in only one respect. The panel's majority held that Power's damages under EMTALA were limited to $1 million by Virginia's statutory caps on medical malpractice and charitable hospital liability. *See Power v. Arlington Hosp. Ass'n,* 42 F.3d 851, 860–65 (4th Cir.1994), *aff'g in part and rev'g in part* 800 F.Supp. 1384 (E.D.Va.1092).[6] As a result, Power's $5 million verdict against the Hospital was re-

---

F.Supp. 1384, 1386 (E.D.Va.1992), *aff'd in part and rev'd in part,* 42 F.3d 851 (4th Cir.1994).

**4.** This suit also included two counts based on state law, a battery claim and a claim for emotional distress. Prior to trial, the Court dismissed the state-law counts without prejudice on the ground that the claims had not been subjected to the Virginia Malpractice Act's review processes, *see* Va.Code §§ 8.01–581.1, *et seq.,* and on the alternative ground of the district courts' discretionary power to dismiss supplemental claims. *See* 28 U.S.C. § 1367(c); *Power,* 800 F.Supp. at 1387 n. 5.

**5.** Virginia's Medical Malpractice Act provides a scheme by which malpractice complaints against

health care providers may be reviewed by a panel consisting of attorneys, health care professionals, and a circuit court judge. The panel's opinion is admissible as evidence in any action subsequently brought by the claimant. *See* Va. Code §§ 8.01–581.1 to –581.20. The Act was extensively revised in 1993 and 1994, but the provisions that are central to the case at bar were not affected.

**6.** Chief Judge Ervin, in an opinion concurring in part and dissenting in part, agreed with this Court's view that recoveries under EMTALA are not subject to either Virginia's medical malpractice damages cap or its charitable hospital liability limit. *See Power,* 42 F.3d at 869. The panel majority concluded otherwise. *Id.* at 860–65.

duced to a final order of judgment for $1 million.

Both appeals having concluded, Power's long-dormant malpractice action was revived. Power consented to dismissal of the Hospital on the ground it had already been held liable for $1 million in the EMTALA action. Given the Fourth Circuit panel's ruling that EMTALA damages count toward Virginia's malpractice and charitable hospital liability caps, further recovery from the Hospital was plainly barred by statute. The remaining defendants, Dr. Semmes and APG, then moved to dismiss, contending that Power's $1 million EMTALA award constitutes the entire amount recoverable by her under Virginia's $1 million medical malpractice cap, regardless of which other defendants she might wish to sue or legal theories she might wish to raise. In response, Power contends that while a $1 million cap applies to her EMTALA award against the Hospital, a second $1 million cap applies to her malpractice action against Dr. Semmes and APG. Both parties having fully briefed the issues presented by defendants' threshold dismissal motion, that motion is now ripe for decision.

## II.

■ The parties' central disagreement concerns the operation and effect of Virginia's medical malpractice damages cap. Interpretation of this or any statute properly begins with the statute's language. *See United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981). Virginia's statute provides that "[i]n any verdict returned against a health care provider in an action for malpractice ..., the total amount recoverable for an injury to, or death of, a patient shall not exceed one million dollars." Va.Code § 8.01–581.15.[7] The statute further defines "malpractice" as "any tort based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient." Va.Code § 8.01–581.1.[8]

■ This plain and unambiguous statutory language announces the principle dispositive here: an injured patient may recover no more than $1 million for injuries arising from one malpractice event.[9] And, as the language also reflects, this principle holds whether the patient sues one defendant or many, whether she files one action or several separate ones, or whether she proceeds under more than one legal theory or cause of action constituting "an action for malpractice" under the statute. Moreover, a patient cannot avoid the $1 million cap by characterizing each of the health care providers' mistakes that contribute to her injury as a separate instance of malpractice. The statute, which was intended to assure affordable medical malpractice insurance by limiting

7. The statute provides, in pertinent part, that: In any verdict returned against a health care provider in an action for malpractice where the act or acts of malpractice occurred on or after October 1, 1983, which is tried by a jury or in any judgment entered against a health care provider in such an action which is tried without a jury, the total amount recoverable for any injury to, or death of, a patient shall not exceed one million dollars.

8. There is no dispute that both Dr. Semmes and APG are "health care providers," which the statute defines to include (i) a person or corporation licensed to provide health care or professional services as a physician, hospital, or health maintenance organization, and (ii) a professional corporation, all of whose shareholders or members are so licensed. *See* Va.Code § 8.01–581.1.

9. The statute, it must be noted, uses the term "injury" in the singular. *See* Va.Code § 8.01–581.15. In ordinary parlance, one might say that Power suffered multiple injuries, since she incurred severe harm to many different parts of her body. But the word "injury" may also be used to refer collectively to a constellation of harms arising from a particular act or treatment. A moment's reflection confirms that the statute uses the term in this sense, for acts of malpractice typically, if not always, result in numerous harms, which collectively are the malpractice injury. Thus, a negligent failure to diagnose tuberculosis might well result in a variety of harms, including fever, chills, night sweats, weight loss, appetite loss, weakness, coughing, and lesions of the lungs, bone, lymph nodes, and other organs. Surely, the General Assembly of Virginia did not intend that each of these harms is entitled to a separate $1 million damages cap. In addition, the statute allows only a single $1 million recovery for the death of a patient, and it surely does not allow greater recovery to a patient who survives the same malpractice and suffers multiple symptoms, wounds, or impairments. Thus, a second $1 million cap applies only when a patient suffers two distinct, divisible injuries from two separate malpractice episodes.

health care providers' liability, would be rendered ineffective and would not achieve its purpose if recovery could be multiplied as easily as Power suggests. In sum, one claimant, with one indivisible malpractice injury, is subject to a single $1 million cap on her malpractice damages.[10]

This conclusion finds firm support in prior opinions construing the statute. Thus, the Supreme Court of Virginia has held that the statute does not mean that a plaintiff can recover $1 million from each health care provider involved, but instead imposes a damages cap of $1 million per malpractice injury. See *Etheridge v. Medical Ctr. Hosps.*, 237 Va. 87, 376 S.E.2d 525, 534–35 (1989). And a malpractice claimant may not avoid the cap limit simply by identifying additional health care providers as having contributed to the malpractice injury. In other words, if seven doctors' concurrent malpractice injures a patient, she may recover up to $1 million, not $7 million. Thus, the fact that Power now sues Dr. Semmes and APG rather than, or in addition to, the Hospital does not entitle her to escape the cap's effect and recover more than the $1 million she has already been awarded.

The Supreme Court of Virginia has also made clear that a patient's recovery for one malpractice injury is limited to $1 million "regardless of the number of legal theories upon which the claims are based." *Bulala v. Boyd*, 239 Va. 218, 389 S.E.2d 670, 675 (1990).[11] Power unsuccessfully attempts to distinguish *Bulala* on the ground that negligence and EMTALA are not merely different "legal theories," but rather they are different "causes of action." This distinction is illusory. The circumstances of an injury may give rise to a variety of distinct causes of action, each of which constitutes "an action for malpractice" under the statute. Some may be based on state common law, such as negligence or battery, while others may arise from federal statutes such as EMTALA. The standards, remedies, and purposes of the causes of action may differ markedly. Yet, the statute provides that a single $1 million cap applies to all of a patient's "malpractice" claims, regardless of the particular theory or body of law on which they are based. It is therefore beside the point that, as Power repeatedly asserts, an EMTALA action is different from a negligence or traditional malpractice claim.[12]

■ There are several situations in which the statute does not limit recovery to a single $1 million cap. None of these exists here. For instance, because the statute allows up to $1 million damages *per patient*, malpractice that injures more than one patient may give rise to liability greater than $1 million. *See Bulala*, 389 S.E.2d at 675 (permitting total recovery of $2 million where malpractice proximately caused injury both to pregnant woman and to her unborn child). Yet here, there is no dispute that only one patient is involved.

In addition, the statute only limits or affects a plaintiff's recovery on a claim that constitutes "an action for malpractice" against a "health care provider." Va.Code § 8.01–581.15.[13] There can be no doubt that Power's action against Dr. Semmes and APG is an action for medical malpractice. Nor is

---

**10.** Power makes the textual argument that the statute provides a separate $1 million cap for each "verdict returned against a health care provider." Va.Code § 8.01–581.15. This interpretation, which ignores the language providing that the "total amount recoverable for any injury" shall not exceed $1 million, has been squarely rejected by the Supreme Court of Virginia. *See Etheridge v. Medical Ctr. Hosps.*, 237 Va. 87, 376 S.E.2d 525, 534–35 (1989).

**11.** In *Bulala,* the Supreme Court of Virginia answered questions certified to it by the Fourth Circuit. *See Boyd v. Bulala,* 877 F.2d 1191 (4th Cir.1989); *Boyd v. Bulala,* 905 F.2d 764 (4th Cir.1990).

**12.** As the majority opinion in *Power v. Arlington Hospital Association* stated, the "conclusion that Virginia's medical malpractice damages cap applies to Power's EMTALA claim ... does not undermine our clear holdings ... that EMTALA was not intended to displace state malpractice law." 42 F.3d at 864.

**13.** *Cf. Glisson v. Loxley,* 235 Va. 62, 366 S.E.2d 68, 71–72 (1988) (holding that breach of contract claim, unlike battery claim, does not constitute "action for malpractice"); *Fairfax Hosp. Sys., Inc. v. Nevitt,* 249 Va. 591, 457 S.E.2d 10 (Va. 1995) (considering effect of settlement by tortfeasor who was not "health care provider" on malpractice judgment obtained against hospital).

there any doubt now, given the majority opinion in *Power v. Arlington Hospital Association*, that Power's EMTALA claims against the Hospital also constituted an action for malpractice under the statute. *See* 42 F.3d at 860–61. Thus, Power has already recovered $1 million in what must be deemed an action for malpractice, namely her EMTALA suit, and therefore cannot recover further malpractice damages.

■ Finally, a plaintiff who is injured two or more times, by distinct episodes of malpractice, is subject to a separate $1 million cap for each injury. *See Bulala*, 389 S.E.2d at 675 (single cap applies to each "indivisible injury"); *Etheridge*, 376 S.E.2d at 535 (same). Simple examples illustrate this point. If several surgeons make numerous errors during an operation that results in the patient's death, a single cap of $1 million applies. But if a person receives faulty treatment from her dentist, and later is injured by negligent surgery to her knee, she may recover up to $1 million for each of the two separate and divisible injuries.

In her malpractice action against Dr. Semmes and APG, Power seeks to recover damages for the same injury for which she already recovered $1 million from the Hospital under EMTALA. Each action is based on the treatment and diagnosis Power received from doctors at the Hospital's emergency room on February 24 and 25, 1990. This treatment and diagnosis all related to the same infection suffered by Power. The severe harm that Power suffered as a result of the EMTALA violation is inseparable from the injury that resulted from the alleged malpractice. Having suffered one indivisible set of injuries all stemming from the same malpractice event, Power is entitled to no more than $1 million under the statute.

■ This conclusion is not altered by the fact that Power can point to many separate and distinct acts by various doctors and other parties in the course of her treatment. For example, Power emphasizes that the EMTALA verdict was based on the Hospital's failure to provide appropriate blood tests on the morning of February 24, but that her allegations against Dr. Semmes and APG in the malpractice action go further. She alleges that they misdiagnosed urinalysis results later that morning, that they provided her inadequate advice during telephone calls later that day, and that they again misdiagnosed and improperly treated her the following morning when her condition worsened and she returned to the Hospital. There is no question that Power's treatment involved many distinct acts, by several individuals, or that different acts were at issue in her EMTALA suit against the Hospital and in her malpractice complaint against Dr. Semmes add APG. Yet, contrary to Power's assertions, the statute does not apply a separate $1 million cap to each individual negligent act by health care providers, or to each visit and telephone call between a patient and her doctors. Rather, the statute only allows $1 million per injury, even if the injury arises from several wrongful acts during the course of treatment.

Despite the clear meaning of the statute's text and the case law interpreting it, Power contends that neither Congress nor the Virginia legislature could have intended that a $1 million EMTALA judgment against a hospital would prevent any and all recovery from physicians who committed malpractice. Power believes that the Hospital, physicians, and physicians groups involved in her treatment each should bear liability in fair proportion to their responsibility for her injury. None should escape liability simply because Power already obtained a $1 million judgment against the Hospital. According to Power, the problem is particularly acute where, as here, the doctrine of contribution does not operate to redistribute the burden of the $1 million judgment among the several culpable parties.

Power's assumption that the Hospital could not bring a successful contribution action against Dr. Semmes or APG is highly questionable. By statute in Virginia, "[c]ontribution among wrongdoers may be enforced when the wrong results from negligence and involves no moral turpitude." Va.Code 8.01–34. Power was not required to allege or prove negligence to prevail on her EMTALA claim against the Hospital for disparate provision of health care services. *See Power*, 42 F.3d at 860–61; *Lane v. Calhoun–Liberty*

*County Hosp. Ass'n,* 846 F.Supp. 1543, 1550–51 (N.D.Fla.1994). Yet, the fact that Power was not required to prove negligence to recover under EMTALA does not mean that the events underlying her EMTALA claim did not involve negligence. Thus, in her medical malpractice action, Power has clearly alleged that the harm she has suffered resulted from negligent actions of the Hospital, Dr. Semmes, and APG. If her allegations are true, the Hospital may persuasively argue for contribution on the ground that the wrong done to Power resulted from negligence.[14]

■ In addition, it is well-established under Virginia law that "before contribution may be had it is essential that a cause of action by the person injured lie against the alleged wrongdoer from whom contribution is sought." *Bartlett v. Roberts Recapping, Inc.,* 207 Va. 789, 153 S.E.2d 193, 196 (1967). In other words, a contribution plaintiff (the Hospital) can obtain contribution only if the injured person (Power) had a cause of action against the contribution defendants (Dr. Semmes and APG). It is true that Power does not have a cause of action under EMTALA against Dr. Semmes or APG. *See Power,* 800 F.Supp. at 1386; supra note 3. But Power claims to have a valid claim against them for medical malpractice.[15] She assumes, without authority, that the Hospital could not obtain contribution toward the EMTALA judgment from a party that was liable to Power under a cause of action other than EMTALA. Yet, Virginia courts have never indicated that the same cause of action by the injured person must lie against both the contribution plaintiff and the contribution defendants.[16] Rather, they have stated simply

---

14. Power suggests not only that the Hospital cannot obtain contribution toward the $1 million judgment against it, but also that this situation is unique to cases involving EMTALA. This is not so. Battery, like an EMTALA claim, is a cause of action that requires no proof of negligence and, also like EMTALA, may constitute "malpractice" under Virginia's statute. *See Pugsley v. Privette,* 220 Va. 892, 263 S.E.2d 69, 71 (1980) (negligence is not element of battery); *Glisson v. Loxley,* 235 Va. 62, 366 S.E.2d 68, 72 (1988) (battery claim constitutes action for malpractice). Thus, there may be situations where a patient recovers $1 million in a battery or an EMTALA suit against a health care provider, no negligence was involved, and therefore a contribution action against other culpable health care providers is not available under Virginia law. By contrast, where no showing of negligence was required to obtain a $1 million judgment for battery or an EMTALA violation, but negligence was nonetheless present, contribution may be available. Again, this result is neither unique to EMTALA cases nor persuasive evidence that the statutory cap must apply separately to each cause of action pursued by an injured patient. Moreover, to the extent that EMTALA claims do create unique inequities under the statute, this is merely an argument that it is wrong to apply the medical malpractice damages cap to EMTALA claims at all, a position already rejected by the Fourth Circuit panel majority in *Power v. Arlington Hospital Association. See* 42 F.3d at 860–64, *rev'g,* 800 F.Supp. at 1387–91.

15. Of course, the Court concludes in this opinion that, even if Dr. Semmes and APG committed malpractice, Power is now barred from recovering damages from them due to the malpractice damages cap in § 8.01–581.15 and the $1 million EMTALA judgment against the Hospital. But the fact that Dr. Semmes and APG can no longer be held liable to Power for malpractice does not bar a contribution action by the Hospital against them. The Supreme Court of Virginia has held that "in order for contribution to lie, the injured party's cause of action against the third-party defendant need not be *presently* enforceable; it merely is necessary that the plaintiff, at *some time* in the past, have had an enforceable cause of action against the party from whom contribution is sought." *Gemco–Ware, Inc. v. Rongene Mold & Plastics Corp.,* 234 Va. 54, 360 S.E.2d 342, 344 (1987) (contribution claim is not barred by fact that it was asserted after statute of limitations expired on injured person's cause of action against contribution defendant).

16. Language in a few cases has implied that the contribution plaintiff and contribution defendants must be liable to the injured party under the same cause of action. *See, e.g., North River Ins. Co. v. Davis,* 274 F.Supp. 146, 149 (W.D.Va. 1967) ("[T]he right to contribution arises only when one of the joint tortfeasors has paid a claim for which the other wrongdoer is also liable."), *aff'd,* 392 F.2d 571 (4th Cir.1968). Yet, other cases have strongly suggested the opposite. For example, in *Richmond, F. & P. R.R. Co. v. Davis Indus., Inc.,* 787 F.Supp. 572 (E.D.Va.1992), Washington Gas was held liable under the federal CERCLA statute and Virginia common law for dumping hazardous waste, specifically leaking air conditioners, on a railroad's property. Washington Gas sought contribution from the manufacturer of the air conditioners on the theory that the manufacturer was liable to the railroad for negligent manufacture and failure to warn of the air conditioners' hazards. Although the Court expressed skepticism about whether the railroad in fact had a cause of action against the manu-

that the injured person's claims against each must relate to the same "indivisible injury." *Laws v. Spain,* 312 F.Supp. 315, 318 (E.D.Va. 1970); *American Tobacco Co. v. Transport Corp.,* 277 F.Supp. 457, 461 (E.D.Va.1967); *Virginia Elec. & Power Co. v. Wilson,* 221 Va. 979, 277 S.E.2d 149, 150 (1981); *Norfolk S. R.R. Co. v. Gretakis,* 162 Va. 597, 174 S.E. 841, 842 (1934).[17] Although its courts have never directly addressed the issue, Virginia thus appears to follow the rule adopted in other states that contribution is permitted where two or more persons are subject to liability for the same indivisible harm, though under different legal theories or causes of action.[18] In sum, if Dr. Semmes and APG committed malpractice, as Power alleges, they may well be liable to the Hospital for contribution of a portion of the $1 million judgment.

In any event, it is unnecessary to resolve these novel questions of Virginia law here, because the operation of the malpractice damages cap plainly does not depend on the availability of contribution. The proportionality principle espoused by Power is simply not a part of the statute. The General Assembly of Virginia did not create an exception to allow a second $1 million of malpractice damages where necessary to insure a just and fair allocation of liability among wrongdoers. Nor did it provide for special treatment of cases in which the patient's first recovery for malpractice is obtained pursuant to EMTALA or in any other manner that might preclude a subsequent contribution action. If § 8.01–581.15 of the Virginia Code applies to EMTALA actions, as the Fourth Circuit panel held in Power's earlier case, it must apply to them in the same manner as other malpractice actions. A patient who recovers $1 million in a negligence suit against one health care provider cannot recover more damages for the same injury from a second, even more culpable health care provider. See *Etheridge,* 376 S.E.2d at 534–35. Similarly, Power, having recovered

facturer, the Court acknowledged that contribution could lie even if Washington Gas and the manufacturer were liable to the railroad for the same harm under different theories. *See id.* at 578.

17. The reason that the injured person must have some cause of action against the target of the contribution claim is that a contribution action merely redistributes liability, and cannot create liability that does not otherwise exist. *See Laws,* 312 F.Supp. at 318; *Norfolk S. R.R.,* 174 S.E. at 842. In other words, if the contribution defendant had no liability to the injured person, he should not be obligated to contribute toward paying a judgment won by the injured person. There is nothing in this rationale to suggest that contribution will not lie between two parties who are liable under different causes of action for one indivisible injury to another. If Dr. Semmes and APG in fact committed malpractice, allowing the Hospital to obtain contribution from them will not create liability where it never previously existed.

18. The precedential weight of decisions from other jurisdictions is reduced by the fact that contribution is a statutory right that is codified differently in various states. *See, e.g.,* Va.Code § 8.01–34. Yet, the strong consensus apparent in the case law is that, if both the contribution plaintiff and the contribution defendant are commonly liable for the same indivisible harm, there is no reason to require that the injured person have the same type of claim against each of them. *See, e.g., Chicago, R.I. & P. R.R. Co. v. Chicago &*

*N.W. Ry. Co.,* 280 F.2d 110, 114 (8th Cir.1960) (allowing contribution under Iowa law between two railroads liable for violations of different statutes), *cert. denied,* 364 U.S. 931, 81 S.Ct. 378, 5 L.Ed.2d 364 (1961); *Wallace v. Strassel,* 479 So.2d 231, 234 (Fla.Dist.Ct.App.1985) (permitting dog owner subject to strict liability under statute to obtain contribution from party whose negligence contributed to same injury); *Economy Eng'g Co. v. Commonwealth,* 413 Mass. 791, 604 N.E.2d 694, 697 (1992) (allowing party who is liable on theory of breach of warranty to obtain contribution from another whose negligence contributed to same injury); *Farmers Ins. Exch. v. Village of Hewitt,* 274 Minn. 246, 143 N.W.2d 230, 233 (1966) (approving contribution where one party's liability rested on negligence and another was liable under dram shop act); *Petersen v. Tolstow,* 184 N.J.Super. 84, 445 A.2d 84, 86 (Law Div.1982) (allowing dog owner liable under statute to recover contribution from party liable for negligence); *Aalco Mfg. Co. v. City of Espanola,* 95 N.M. 66, 68, 618 P.2d 1230, 1232 (1980) (sustaining contribution between city liable under negligence theory and manufacturers liable under strict products liability theory); *Jakobleff v. Cerrato, Sweeney & Cohn,* 97 A.D.2d 786, 468 N.Y.S.2d 894 (1983) (allowing contribution between one party liable in contract and one liable in tort for the same harm); *Sydenstricker v. Unipunch Products, Inc.,* 169 W.Va. 440, 288 S.E.2d 511, 518 (1982) (recognizing that party may assert contribution claim against another party liable for same injury under different theory); *see also* 18 *Am.Jur.2d Contribution,* § 10 (1985).

$1 million from the Hospital under EMTA-LA, cannot recover further malpractice damages from Dr. Semmes or APG.

## III.

In sum, Virginia's statutory cap on medical malpractice damages prevents recovery in this action.[19] As a result, the motion to dismiss filed by defendants Dr. Semmes and APG must be granted.

An appropriate order will issue.

---

19. According to Power, the only legal principle under which the $1 million EMTALA judgment against the Hospital could conceivably bar recovery from Dr. Semmes and APG is the doctrine of issue preclusion, also known as *collateral estoppel.* Power argues at length that the required elements of issue preclusion are not satisfied here. This argument is neither persuasive nor entirely coherent. It is the statute, Va.Code § 8.01–581.15, that bars further recovery. Defendants do not rely on issue preclusion, nor do they have any need to do so. Power also argues that defendants' position violates principles stated in cases in which a settlement reached with one tortfeasor is applied to offset a verdict against non-settling tortfeasors. *See, e.g., McDermott, Inc. v. AmClyde,* —— U.S. ——, —— – ——, 114 S.Ct. 1461, 1465–66, 128 L.Ed.2d 148 (1994); *Hayman v. Patio Products, Inc.,* 226 Va. 482, 311 S.E.2d 752 (1984). These cases simply have no application here. Again, it is the statute, rather than a prior settlement, that bars the recovery Power seeks.